IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior District Judge Richard P. Matsch

Civil Action No.  02-cv-01977-RPM
(Consolidated with Civil Action No. 02-cv-01978-RPM for pretrial purposes)

SPA UNIVERSAIRE,
VACATION TAN & TRAVEL,
DOUGLAS CHEESMAN,
CARL LESHER,
ROXANNE LEWIS,
DENNIS LINDEMAN,
DOUG MACKEY,
LORI R. VALDEZ, and
KENT FITZGERALD,
individually and on Behalf of All Others Similarly Situated.

  Plaintiffs,

v.

QWEST COMMUNICATIONS INTERNATIONAL, INC., and
QWEST CORPORATION,

  Defendants.

## ORDER DENYING CLASS CERTIFICATION

  On March 7, 2003, Spa Universaire and Vacation Tan & Travel filed a Consolidated Amended Class Action Complaint alleging 8 claims for relief against the defendants Qwest Communications International, Inc., and Qwest Corporation ("Qwest") seeking damages and injunctive relief on behalf of a class generally described as all "Local Telephone Service" customers in those portions of the states served by Qwest as the incumbent local exchange carrier ("ILEC") who have been injured by the alleged anti-competitive conduct of Qwest.  The first 4 claims, identified

as Counts I-IV, charged violations of Section 2 of the Sherman Act and Count VII alleged violations of the antitrust laws of the states identified as the geographic market. Count V alleged unreasonable restraint of trade under Section 1 of the Sherman Act, Count VI alleged a violation of Section 202 of the Federal Communications Act of 1934 ("FCA") and Count VIII alleged unjust enrichment without reference to any state law. Because the issue of the relationship between the duties imposed upon incumbent local telephone companies by the Telecommunications Act of 1996 ("1996 Act") and Section 2 of the Sherman Act was pending before the Supreme Court, the defendants moved to stay the action. The Court denied the stay and on May 12, 2003, the defendants moved to dismiss the antitrust claims; the unjust enrichment claim; and the FCA claim.

The Supreme Court decided *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP,* 540 U.S. 398 (2004) on January 13, 2004. The plaintiffs on January 23, 2004, filed a notice withdrawing all of their claims under Section 2 of the Sherman Act and corresponding state law claims. The defendants sought to extend the reasoning of *Trinko* to the Section 1 claim and, after briefing, this Court on March 18, 2005, ruled that the *Trinko* opinion did not foreclose claims for contracts in restraint of trade, illegal price discrimination, predatory pricing, illegal market allocation and conspiracy under Section 1. Acknowledging that the allegations of the amended complaint were conclusory but sufficient to constitute notice pleading, the Court denied the motion to dismiss Count V and Count VI. Count VIII was dismissed for insufficient pleading.

At a scheduling conference held on June 24, 2005, the Court directed that discovery proceed on matters relevant to the determination of a motion for a class certification and delayed merits discovery.  A scheduling order entered on July 28, 2005, and was subsequently amended on August 8, 2005.

On June 23, 2006, the plaintiffs, including the individual plaintiffs who were permitted to join this action, filed a motion to certify the following class:

> All persons and entities (other than defendants, their affiliates, successors and assigns) who subscribed to basic local exchange service in the Service Area by means of circuit-switched twisted pair wireline facilities during the period from October 2, 2000 through July 8, 2004 (the "Class").  The Class is further subdivided into the: "Arizona Subclass;" "Colorado Subclass;" "Iowa Subclass;" "Minnesota Subclass;" "New Mexico Subclass;" "Oregon Subclass;" "Utah Subclass;" and "Washington Subclass" (collectively, the "Subclasses").

The plaintiffs' claims must be considered in the context of the fundamental change in the regulation of telecommunications made by the Telecommunications Act of 1996 from a system which granted regulated monopolies to one of regulated competition in the provision of local telephone service.

The 1996 Act "fundamentally change[d] telecommunications regulation" from a regulated monopoly regime to one of regulated competition.  First Report and Order, *Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, FCC 96-325, CC Docket No. 96-98, 95-185, 11 FCC Rcd. 15499, ¶¶ 1-2 (Aug. 8, 1996).  The Federal Communications Commission ("FCC") summarized the new regime in these words:

> Historically, regulation of this industry has been premised on the belief that service could be provided at the lowest cost to the maximum number of consumers through a regulated monopoly network.  State and federal regulators devoted their efforts over many decades to regulating the

>  prices and practices of these monopolies and protecting them against
>  competitive entry. The 1996 Act adopts precisely the opposite approach.
>  Rather than shielding telephone companies from competition, the 1996
>  Act *requires* telephone companies to open their networks to competition.

*Id.* ¶ 1 (emphasis added).

Before passage of the 1996 Act, Qwest was primarily a retail provider of local telephone service.  Under the Act, it is classified as an ILEC.  It and all other such regulated monopolies were required to open their provider networks to competition in specific ways.  47 U.S.C. § 251(c)(1) requires each ILEC to negotiate interconnection agreements with its local competitors (competitive local exchange carriers or "CLECs") setting the terms of and prices for interconnection, giving access to unbundled network elements, or access to an ILEC's services for resale.  The 1996 Act provides that upon request of a telecommunications provider, the interconnection must be on rates, terms, and conditions that are "just, reasonable, and nondiscriminatory," *id.* § 251(c)(2)(D); the ILEC must provide "unbundled" access to elements of its network that are critical for the competitor, *id.* § 251(c)(3), (d)(2)(A)-(B); the ILEC must allow competitors access to its premises to assure interconnection, *id.* § 251(c)(6); and the ILEC must provide any service it offers at wholesale rates to its competitors.  *Id.* § 251(c)(4)(A).

The 1996 Act is implemented through a negotiation/arbitration regime under the supervision of state regulatory commissions.  *See* 47 U.S.C. § 252(a), (b).  ILECs must first negotiate in good faith with any CLEC that requests interconnection.  *Id.* § 251(c)(1).  If the parties cannot agree on terms, the state commission resolves any disputed issues through binding arbitration.  *Id.* § 252(b).  Every interconnection agreement must be approved by the pertinent state commission, whether arrived at

through negotiation or arbitration.  *See id.* § 252(e)(1).  All interconnection agreements must be filed with the relevant state commission and made available for public inspection, *id.* § 252(h), so that other CLECs may "opt into" all or part of an interconnection agreement between the ILEC and another carrier.  *Id.* § 252(i).

During the proposed class period in this case, CLECs could opt into individual terms of another carrier's interconnection agreement, so long as the requesting carrier accepts other terms that are legitimately related to the desired term.  For example, the FCC ruled that

> where an incumbent LEC and a new entrant have agreed upon a rate contained in a five-year agreement, section 252(i) does not necessarily entitle a third party to receive the same rate for a three-year commitment. Similarly, that one carrier has negotiated a volume discount on loops does
> not automatically entitle a third party to obtain the same rate for a smaller amount of loops.

First Report & Order, *Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, ¶1315, 11 FCC Rcd. 15499, 16139.  In July of 2004, the FCC amended its interpretation, requiring CLECs to opt into entire agreements instead of specific terms.  *Matter of Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers*, CC Docket No. 01-338, 19 FCC Rcd. 13494 (July 8, 2004).  This change marks the end of the proposed class period.

The plaintiffs' Consolidated Amended Class Action Complaint alleges that Qwest violated Section 1 of the Sherman Act and Section 202 of the FCA, 47 U.S.C. § 202, by entering into interconnection agreements with some competitive local exchange carriers, without filing for approval by the appropriate state regulators.  The motion for

5

class certification references just two of these "secret agreements" – one with Eschelon Telecom, Inc. and one with McLeodUSA, Inc. The core of this case is that because these agreements were not made public, other CLECs were not aware of their terms and conditions that would be available to them and thus could not opt into them or negotiate similar arrangements. Thus, the plaintiffs assert that Qwest customers paid supracompetitive prices and CLEC customers were denied better prices and different services.

These two agreements gave McLeod and Eschelon a ten percent interconnection discount. The plaintiffs allege that the failure to make these agreements public denied other CLECs the opportunity to compete for local telephone service customers in violation of Sherman Act § 1 and that Qwest engaged in price discrimination in violation of § 202 of the FCA. The plaintiffs have limited their action to these two interconnection agreements because they are the only ones containing identified favorable price discounts.

Each of the named plaintiffs subscribed directly from Qwest for traditional "twisted pair" wireline telephone service in their respective states and they seek to represent Qwest and CLEC subscribers in those respective states during the class period which ended when the FCC changed its interpretation with respect to the opt-in authority. The FCA claim is made on behalf of CLEC subscribers which the plaintiffs say are "fairly encompassed" within their claims. The plaintiffs will seek to amend the amended complaint to conform the allegations to this claim.

The relevant product is said to be "local telephone service" consisting of "bundles" including a dial tone, calling plan minutes, features such as Caller I.D. and call waiting, regional calls, and "exchange access service" needed to connect to a long-distance carrier.

As previously noted, the parties have conducted extensive discovery relevant to the issues that must be addressed for class certification under Fed.R.Civ.P. 23(a) and (b)(3). The plaintiffs and defendants have proffered expert opinions of Dr. Hayes and Dr. Dorman on issues relevant to class certification.

To obtain certification, the putative class representatives must meet the four requirements of Rule 23(a) by showing that (1) the class is so numerous that the joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. An action may be maintained as a class action under Rule 23(b)(3) if these requirements are met and if the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members and a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Among the matters pertinent to these findings are the desirability or undesirability of concentrating the litigation of the claims in this forum and the difficulties likely to be encountered in the management of the class action.

The defendants' opposition to class certification begins with the contention that the class definition is fatally flawed because the members of the class are not identifiable without a detailed individual inquiry. The class includes both residential and commercial subscribers in eight states where Qwest is the ILEC. The definition includes Qwest customers and those who were customers of other carriers within those states and during the class period. Qwest concedes that it could identify its customers from its records but asserts that almost 400 CLECs were authorized to provide local exchange services within the same states during the same time period.

The class is limited to twisted pair wireline facilities, excluding local telephone services provided by other technologies such as cable, wireless and VoIP. An additional complication suggested by Qwest is that each subscriber was free to change local telephone service providers and the type of service. Thus, plaintiff Vacation Tan & Travel has produced telephone bills showing that it received local services from Allegiance Telecom and then switched to Eschelon Telecom during the class period.

The plaintiffs counter that the vast majority of class members can be identified from Qwest's records and assert that the number of CLECs actually operating in the eight states at issue were far fewer than those authorized to do so. The plaintiffs suggest that Qwest would be asked to produce a list of interconnecting CLECs and their records would then be subpoenaed to obtain customer identities and also assert that there is no need to identify those who receive service through alternative technologies because they are excluded from the class. The difficulties involved in identifying class

membership relate to other issues relevant to class certification as will be identified later.

On December 8, 2005, the plaintiffs filed a motion for a partial summary judgment of liability to plaintiffs in Minnesota, Arizona, Washington and New Mexico because rulings made by the regulatory authorities in those states should be given collateral estoppel effect.  The state regulators in contested proceedings found that Qwest had failed to file interconnection agreements which were required to be filed under the Act and that those failures damaged competition in those states by denying other CLECs the opportunity to opt in to favorable terms of those secret agreements. The Minnesota Public Utilities Commission ordered Qwest to pay a penalty of $25.95 million and ordered "restitution" to CLECs based on findings that agreements with Eschelon, McLeod, Covad Communications Company, USLink, Inc., and a group of ten smaller CLECs violated both the Telecommunications Act and state law.  That order was appealed and in *Qwest v. Minnesota Public Utilities Com'n,* 427 F.3d 1061 (8th Cir. 2005) the Eighth Circuit Court of Appeals affirmed the District Court's ruling that the penalty was authorized by state law but reversed the order for restitution because that remedy was not within the statutory authority of the Commission.

The plaintiffs also urged in support of the motion for judgment of liability under § 1 of the Sherman Act and § 202 of the FCA that when the FCC approved Qwest's application to enter long distance markets under § 271, the FCC found that as of the date of approval Qwest had met its obligations to interconnect with CLECs on a non-discriminatory basis.  The FCC explicitly did not address past alleged violations,

9

saying that it anticipated that any violations would be addressed through federal and state complaint and investigation proceedings. The plaintiffs suggest that the FCC contemplated such actions as this, impliedly endorsing them.

The plaintiffs' motion for partial summary judgment was denied as premature and inconsistent with this Court's direction that determination of the class action certification issue should be made before any merits ruling. While that is consistent with well established procedure under Rule 23, the effect of these state regulatory orders must now be considered because that question underlies the relevant question of whether common issues of law or fact predominate over questions affecting only individual class members. The plaintiffs' position has changed from their filed summary judgment papers to narrow the issue to the two secret agreements that contain favorable pricing. What the plaintiffs are contending now is that the cost advantage given to McLeod and Eschelon must necessarily result in an injury to competition and constitutes discriminatory pricing. That argument will not be supported by giving collateral estoppel effect to the state regulatory authorities' rulings because the issues are not identical.

The Minnesota and New Mexico rulings result from findings of injury to competition within those states without a clear definition of the services that constitute the product market. These two regulatory commissions found that Qwest's agreements were contrary to the purposes of the 1996 Act to open or foster competition where there had previously been a monopoly. They did not make findings of injury to the competition protected by the antitrust laws. It is important to recognize that the 1996

Act did not change or alter the Sherman Act and the public policy it embodies for the protection of competition in the national economy.

The Supreme Court discussed traditional antitrust principles in *Trinko,* observing that the detailed regulatory scheme established by the 1996 Act would warrant application of the doctrine of implied immunity if Congress had not explicitly precluded that interpretation by the savings clause in 47 U.S.C. § 152.  The Court was clear, however, in saying that while the 1996 Act preserved claims that satisfy existing antitrust standards, Congress did not create new claims that go beyond existing antitrust standards.  540 U.S. at 407.  Notably, the Court said that Verizon's denial of interconnection services to rivals for the purpose of limiting their entry into the market would state a monopoly claim under § 2 of the Sherman Act, if it states an antitrust claim at all.  It may be inferred that the Court was excluding § 1 claims.  That argument was made in the defendants' motion to dismiss the amended class action complaint.

That motion was denied by this Court under the well established view that under Rule 12(b)(6) a complaint can be dismissed only if it appears beyond doubt that a plaintiff can prove no set of facts in support of a claim which would entitle it to relief. *Conley v. Gibson,* 355 U.S. 41 (1957).  The Supreme Court in the very recent case, *Bell Atlantic Corp. v. Twombly,* 127 S.Ct. 1955 (2007), disavowed that standard and adopted a plausibility standard, at least for antitrust claims.  In so doing, the Court emphasized the burdens of time and expense in antitrust litigation, observing that there is a coercive effect of that burden to induce settlements.  Bell Atlantic dealt with a

Sherman Act § 1 conspiracy in restraint of trade allegation based on parallel conduct of ILECs in staying within their own service territories.

The McLeod and Eschelon contracts are not illegal agreements. The plaintiffs' Section 1 claim asserts that these two agreements with McLeod and Eschelon restrain trade because they were not made public by filing them with the state regulatory authorities, thereby denying other CLECs an opportunity to opt in to their terms or to negotiate similar contracts. It is assumed that the other CLECs would have done so and made their services available to the plaintiffs. Absent the 1996 Act and the FCC regulation, Qwest, McLeod and Eschelon had no duty to disclose their interconnection agreements to others. Their pricing arrangements did not violate any existing antitrust principles. Discriminatory pricing that contravenes the requirements of the 1996 Act could give rise to liability to CLECs proceeding under the private right of action provisions under § 206 and § 207. The theory of damage to the putative plaintiffs' class of consumers of disadvantaged CLECs is not something within the protection of the Sherman Act.

To prove their Sherman Act claim, the plaintiffs must show that Qwest's agreements with Eschelon and McLeod resulted in an unreasonable restraint of competition in all eight states, resulting in antitrust injury to all members of the subclasses of the customers purchasing basic local exchange services in each state and that this injury is measurable in damages. As noted earlier, the rulings of the commissions in some states were not the equivalent of the findings necessary to establish these elements of antitrust liability, even in those states. The authority of

state regulatory commissions to disapprove negotiated interconnection agreements submitted to them is limited by 47 U.S.C. § 252(e)(2) to those that (1) discriminate against a non-party telecommunications carrier, or (2) are found to be inconsistent with the public interest if implemented.  There are no findings by any commission that the two agreements at issue in this case met either of these two deficiencies.  Rather, the commissions found that Qwest's failure to file interconnection agreements was contrary to the 1996 Act's purpose of promoting new competition in their states.

In addition to demonstrating that they may have a provable case of a Sherman Act violation, the plaintiffs must show that there is such commonality that class certification is warranted and that the litigation is manageable as a class action.

Basic to antitrust litigation is the identification of a product market.  Here the plaintiffs identified it as "basic local exchange service" defined as telecommunications service which provides a local dial tone and local usage necessary to place or receive a call within an exchange area.  The local exchange area is restricted to areas where Qwest is the ILEC.

Antitrust injury depends upon showing the effects of the defendant's conduct within a geographic market.  In this case, the plaintiffs seek sub-classes of consumers within the eight states identified, thereby avoiding variations reflecting different state requirements of their respective regulatory authorities.  They rely on an econometric model created by Dr. Hayes.  The modeling is flawed by the failure to correspond to the economic realities of the marketplace and the use of assumptions that are merely speculative.

These flaws are revealed by the results of a survey published by the Iowa Utilities Board (IUB) in January, 2004. (Ex. D).  The IUB report shows important differences among exchanges operating in rural and urban areas as to the services offered and differences in services requested by subscribers in those areas and as between residential and commercial customers.  Some CLECs were offering service only to business customers or high usage customers.  Others were providing only residential customers with service.  Another variable was the variation in choices of combinations of basic exchange service with other services, including long distance, Internet access and cable television.  Some service providers were local municipal utilities.

The IUB subsequently held that local exchange competition should be considered on an exchange-by-exchange basis.  (Ex. I).

These differences among prices, provider choices, customer preferences and local area characteristics shown to exist in the relatively homogenous state of Iowa sufficiently demonstrate the unreliability of the plaintiffs' theory.

The plaintiffs' class includes those who changed services and providers within the 4 years of the class period.  There is no distinction made between subscribers of McLeod or Eschelon and other CLECs.  There is no showing whether these two "favored" CLECs passed on all or part of the "discounts."

The assumptions made in the plaintiffs' model to establish competitive harm from the two undisclosed agreements are counterintuitive and unsupported by any evidence. Thus, Dr. Hayes assumed that the relevant cost for market entry by CLECs is the

14

interconnection cost with Qwest and that other CLECs would have opted in if they had knowledge of the price structure. Dr. Hayes did no analysis of the other CLEC agreements and did not consider the volume requirements of "take-or-pay" purchase provisions in the McLeod and Eschelon contracts.

There is no showing that damages sustained by the putative class members would not be different as a result of these same variables. Dr. Hayes conceded in his deposition that differences between rural and urban customers, business and residential customers and the number of CLECs operating in a particular wire center are all factors in measuring damages to customers. These are in addition to differences in customer needs and preferences.

In sum, the plaintiffs have failed to demonstrate the commonalities required for certification of the broad class they propose for the Section 1 Sherman Act claims.

The FCA claim is asserted only for CLEC customers, represented presently only by Lescher in Oregon and Vacation Tan & Travel in Colorado. 47 U.S.C. § 202(a) prohibits unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities or services by any telecommunications carrier.

To prove illegal discrimination in violation of this section, a plaintiff must answer three questions, "(1) whether the services are 'like'; (2) if they are, whether there is a price difference between them; and (3) if there is, whether that difference is reasonable." *Competitive Telecomm. Ass'n v. FCC*, 998 F.2d 1058, 1061 (D.C.Cir. 1993). A cognizable claim must be based on proof of an injury from discrimination.

*AT&T Co. v. New York City Human Resources Admin.*, 833 F.Supp. 962, 980 (S.D.N.Y. 1993).

The plaintiffs have not shown that generalized evidence can be used on a classwide basis to establish any of the required elements. Their simple suggestion that disfavored CLECs received like services from Qwest at a higher price than Eschelon and McLeod and that such price difference was unreasonable is insufficient.

Qwest has shown that McLeod and Eschelon received interconnection through a platform of bundled elements at a discount requiring a set volume of purchases. Damages may not be measured simply by showing that they received the benefit of the discounted rate. A plaintiff must show it was adversely affected by the fact that because these two carriers paid less for like services they were favored or in some other manner that will vary according to time, place and circumstance just as in Interstate Commerce Act cases. *I.C.C. v. United States,* 289 U.S. 385, 390 (1933). *See also In re Exchange Network Facilities for Interstate Access,* 1 F.C.C. Rcd. 618 ¶ 69 (Nov. 14, 1986).

The plaintiffs contend that the defendants' opposition to class certification is based on challenges to Dr. Hayes and the methodology which they propose to use to prove the elements of the antitrust claim. Thus, they say it is premature and improperly addresses the merits of the claim. While courts must be cautious about resolving disputes among experts that go to the merits of the case, it is the plaintiffs' burden to demonstrate that common evidence exists to support the claim that there may be classwide injury with proof common to the class, to warrant a ruling that common

questions predominate and that class resolution is superior to all other methods for fair and efficient adjudication of the controversy as required by Rule 23(b)(3). *Blades v. Monsanto Co.,* 400 F.3d 562 (8th Cir. 2005); *In re Initial Public Offerings Securities Lit.*, 471 F.3d 24 (2nd Cir. 2006). This, the plaintiffs have not done. Accordingly, it is

ORDERED, that the Motion for Class Certification is denied.

DATED:   September 10th, 2007

BY THE COURT:

s/Richard P. Matsch

_____
Richard P. Matsch, Senior District Judge